Memorandum of decision on a petition filed by the Commissioner of the Department of Children and Families to terminate the parental rights of the respondent mother, Christine B[1] and the biological father, John Doe, with respect to the minor child, Victoria. CT Page 5521-ay
The termination of parental rights is Granted.
 MEMORANDUM OF DECISION
On January, 28, 2000, the Department of Children and Families (D.C.F.) invoked a ninety-six (96) hour hold upon Victoria B, whose date of birth is April 1997. On February 1, 2000, an Order of Temporary Custody (O.T.C.) was applied for and granted by the court (Cohn, J.). The allegation was that Victoria was in immediate physical danger from her surrounding. A concomitant neglect petition was filed alleging that Victoria, was neglected in that: (1) she was being denied proper care and attention physically, educationally, emotionally, or morally, and (2) she was being permitted to live under conditions, circumstances, or associations injurious to her well-being. On February 10, 2000, the O.T.C. was confirmed by the court and preliminary Specific Steps were agreed to by Ms. B and approved by the court (Conway, J.). On September 5, 2000, Ms. B entered an admission to an amended ground of uncared for. The admission was canvassed and accepted by the court (Brenneman, J.). The disposition was commitment of Victoria to D.C.F. from September 5, 2000, to September 5, 2001. Also on this date final Specific Steps were signed by Ms. B and approved by the court. There was no plea from the father of Victoria because a determination as to the identity of Victoria's father was still ongoing. On August 1, 2001, the commitment was extended from September 5, 2001, to September 5, 2002, (Brenneman, J.)
On May 2, 2001, D.C.F. filed a petition seeking to terminate the parental rights of Ms. B. Service was effectuated on Ms. B by leaving a copy of the petition at her usual place of abode. Service was confirmed by the court on May 31, 2001 (Conway, J). D.C.F. has alleged two grounds concerning Ms. B (1) that Victoria had been found in a prior proceeding to have been neglected or uncared for and Ms. B has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the Victoria, she could assume a responsible position in the life of Victoria, and (2) that there is no ongoing parent-child relationship between Victoria and Ms. B. On August 1, 2001, a finding was made that reasonable efforts to re-unify Victoria and Ms. B were no longer appropriate (Brenneman, J.).
A T.P.R. petition was also filed on May 2, 2001, seeking to terminate the parental rights of Milton M the putative father of Victoria, alleging abandonment, failure to rehabilitate and no ongoing parent-child relationship. However, a paternity test excluded Mr. M as Victoria's CT Page 5521-az father and on August 22, 2001, the petition against Mr. M was dismissed (Brenneman, J.). Because no other man has been named by Ms. B as the putative father, nor has any other man come forward since the filing of the T.P.R. petition[2] claiming to be the father of Victoria, D.C.F. is seeking to terminate the parental rights of John Doe alleging abandonment, failure to rehabilitate and no ongoing parent-child relationship. Notice to John Doe was effectuated by publication of notice on August 31, 2001, in the New Haven Register, a newspaper of general circulation in the New Haven area. On October 9, 2001, service for John Doe was confirmed and a default was entered against him by this court.
This court has jurisdiction in this matter and there is no pending action affecting custody of the child in any other court.
The respondent mother, Christina B is opposing the termination of her parental rights and has been represented throughout this entire proceeding by counsel. Victoria is also represented by counsel
The termination of parental rights hearing commenced on October 9, 2001, resumed on October 30, 2001, November 20, 2001, and December 11, 2001. Evidence concluded, and closing arguments were made, on January 29, 2002.
 ADJUDICATORY FINDINGS
The hearing on a petition to terminate parental rights is comprised of two parts.
In the adjudicatory phase the trial court must determine whether any of the statutory grounds alleged by D.C.F. exist by clear and convincing evidence. In the adjudicatory phase the court is limited to considering events preceding the filing of the termination petition or the latest amendment. If a determination is made that one or more of the statutory grounds exists, the court then proceeds to the dispositional phase. In this phase the court determines whether the termination of parental rights is in the best interest of the child. In making this determination the trial court can consider all events occurring prior to the date(s) of the dispositional hearing including those occurring after the filing of the petition.
MS. B — FAILURE TO REHABILITATE
The first ground alleged by D.C.F. concerning Ms. B is that she is the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding and has failed to achieve CT Page 5521-ba such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child. This ground tracks the language contained in Conn. General Statue Section17a-112 (j) (3) (B) (i).
In order to terminate the parental rights of Ms. B, D.C.F. must initially show by clear and convincing evidence that it has made reasonable efforts to locate her and to reunify the child with the her, unless the court finds in this proceeding that the she is unwilling or unable to benefit from these reunification efforts.
The record, by clear and convincing evidence, establishes the following:
The location of Ms. B has never been an issue and her whereabouts have always been known.
Reasonable efforts to reunify Victoria with her mother were deemed no longer appropriate on August 1, 2001 (Brenneman, J.).
Prior to the filing of the neglect petition and the O.T.C., D.C.F. was involved with Ms. B. D.C.F. made referrals to the following agencies/programs/services to address Ms. Bins mental health, domestic violence, anger management, substance abuse, and parenting issues: Addiction Prevention Treatment (A.P.T.), Central Treatment Unit (C.T.U.), Coordinating Counsel for Children in Crisis (4 Cs), Substance Abuse Treatment Unit (S.A.T.U.), Yale Psychiatric Institute (Y.P.I.), Bridges Intensive Family Preservation (I.F.P.), Advanced Behavioral Health (A.B.H.), and West Haven Mental Health (W.H.M.H.). With the exception of the 4 Cs program and A.B.H., Ms. B failed to follow through with these referrals and/or their recommendations. These programs and the participation of Ms. B are detailed on page five (5) of the Social Study For Termination of Parental Rights (Petitioner's Exhibit O).
Following the initiation of court involvement it was the intent of D.C.F. to reunify Victoria with her mother. In order to achieve this reunification preliminary Specific Steps were agreed to by Ms. B on February 10, 2000, and final Specific Steps (Petitioner's Exhibit A) were agreed to by Ms. B on September 5, 2000. In addition, a Service Agreement was entered into between Ms. B and D.C.F., the goal of which was "returning the children home". (Petitioner's Exhibit C). To achieve the goal of reunification Ms. B was referred by D.C.F. to the following programs/agencies/services to address Ms. B's mental health, domestic violence, anger management, substance abuse, and parenting issues: CT Page 5521-bb W.H.M.H., Family Intervention Center (F.I.C.), St. Mary's Hospital Mental Health Clinic (St. Mary's), and Catholic Family Services (C.F.S.). Ms. B was discharged for non-compliance from W.H.M.H., and failed to follow through with F.I.C., St. Mary's and C.F.S. In addition, D.C.F. provided case management services, including visitation with Victoria and transportation to visitation and all service providers.
Therefore, the court finds that D.C.F. has proven by clear and convincing evidence that it has made reasonable efforts to locate Ms. B and it has made reasonable efforts to reunify Victoria with Ms. B.
Statutory grounds exist to terminate parental rights when "[the parent] of a child who has been found by the superior court . . . to have been neglected or uncared for in a prior proceeding . . . has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . ." C.G.S. Section 17a-112 (j) (3) (B) (i). In analyzing a respondent parent's rehabilitative status the court must look at the status as it relates to the particular child, and such rehabilitation must be foreseeable within a reasonable time." (Citations omitted) In reRoshawn R., 51 Conn. App. 44, 54-55 (1998).
For approximately two years prior to the filing of the O.T.C. and the neglect petition D.C.F. provided referrals and gave assistance to Ms. B to address a multitude of problems. Because of Ms. B's failure to take advantage of these programs D.C.F. applied for, and was granted, an O.T.C. on February 1, 2000. The O.T.C. was based on Ms. Bs lack of ability to provide adequate parenting, her unmet mental health issues, her statements that she could no longer take care of Victoria, her statements of wanting to kill herself, and her lack of family resources.
Because of the unique aspects of this case the court will undertake the following bifurcated analysis to determine the issue of if Ms. B has failed to rehabilitate: (1) has Ms. B rehabilitated and (2) if not, is Ms. Bs rehabilitation foreseeable within a reasonable time so that she could assume a responsible position in Victoria's life?
Specific Steps were entered into on the date of adjudication, September 5, 2000. Complying or failure to comply with Specific Steps is important in determining if an individual has failed to rehabilitate.
One of Ms. Bs issues is her mental health. There was extensive testimony from a number of mental health professionals as to the nature CT Page 5521-bc of Ms. B's mental health issues. The Specific Steps (Petitioner's Exhibit A) required Ms. Bino participate in individual counseling at W.H.M.H. or some other provider in the Naugatuck/Waterbury area (Ms. B resided in that area for a period of time). Ms. B failed to comply with this Specific Step. She failed to follow through with I.F.C., St. Mary's, and was discharged form C.F.S. for non-attendance (Petitioner's Exhibit D).
Another Specific Step required Ms. B to maintain adequate housing and legal income. From the date of the adjudication and the signing of the final Specific Steps to the date of the filing of the T.P.R., approximately eight (8) months, Ms, B had four (4) different residence. From the date of the filing of the neglect petition until the date of the adjudication and signing the final Specific Steps, Ms B lived in eight (8) different residences, including hotels, shelters, and a correctional facility. None of theses can be characterized as stable. During the time period between the filing of the neglect petition until the date of adjudication Ms. B had three (3) different jobs, including being a stripper. After the adjudication until the T.P.R. was filed Ms. B had five (5) different jobs.
The Specific Steps also required that Ms. in not have any involvement with the criminal justice system. Ms. in was arrested during this time for motor vehicle offenses and was subsequently placed in an Alternative Incarceration Center (A.I.C.).
Based on the foregoing, D.C.F. has proven by clear and convincing evidence that Ms. B has failed to rehabilitate.
The next step in this analysis is to determine if Ms. Bs rehabilitation is foreseeable within a reasonable time. The central question underlying all the testimony of the mental health professionals is what progress, if any, has Ms. B made while treated for her mental health issues and can this treatment lead to Ms. B being in a position where she can parent Victoria within a reasonable period of time? This analysis will examine the following: what is the nature of Ms. Bs mental health problems; how do these conditions affect Ms. B's ability to parent Victoria; what are the general problems treating individuals with Ms. B's condition; what progress, if any, had Ms. B made prior to August, 2001; what progress, if any, has Ms. B made since August, 2001; what would be the length of time required before Ms. B in would be in a position to parent Victoria and how does taking care of a child and the motivation of a pending T.P.R. effect this time frame; what is the prognosis for Ms. B achieving the mental health stability to parent Victoria? CT Page 5521-bd
The first issue to address is what is Ms. Burridge's mental health condition, "[c]ourts are entitled to give great weight to professionals in parental termination cases." In re Christina V., 38 Conn. App. 214, at 221 (1995).
Three witness testified for the state concerning Ms. Bs mental health: Derek Franklin, Ph.D., who was declared an expert in adult and child psychology; David Krulee, M.D., who was declared an expert in psychiatry; and Cindy Crusto, Ph.D., Ms. B's treating psychologist at W.H.M.H. Althea Conley, M.D. testified for Ms. B. Dr. Conley is a third year psychiatric resident. Dr. Conley also has a Ph.D. in psychology and is Ms. B's treating therapist at C.M.H.C. Dr. Franklin performed two court ordered evaluations of Ms. one on May 9, 2000, and the other on August 21, 2001. Dr Franklin also performed an interactive assessment of Victoria and Ms. B on May 9, 2000, and an interactive assessment of Victoria, Ms. B and Victoria's foster parents, Penny and William C on August 21, 2001. Dr. Franklin prepared a written report of his May 9, 2000, evaluation which was marked as Petitioner's Exhibit E; a written report of his August 21, 2001, evaluation was marked as Petitioner's Exhibit F. Dr. Krulee also conducted a court ordered evaluation of Ms. B on August 20, 2001. A written report of his evaluation was marked as Petitioner's Exhibit G.
Ms. B has related to these mental health professionals, to paraphrase Dr. Franklin, a tragic and dysfunctional history: as a child her family was involved with D.C.F. due to her mother's substance abuse and she was placed with five (5) different foster families between the ages of six (6) and nine (9); while with one of these families she was sexually assaulted by her foster father; she was placed in a residential facility; she ran away from home and was "emancipated" at fifteen (15); she was raped at gunpoint at sixteen (16); she was hospitalized at Riverview Psychiatric Hospital for approximately eight (8) months when she was fifteen (15) for out of control behavior; and she was hospitalized in 1999, at the Yale Psychiatric Institute for a feigned suicide attempt. Until recently, she has lived a chaotic life style: she has been arrested numerous times; she has been both the victim and the perpetrator of domestic violence; she has abused both legal and illegal substances; she has had numerous unstable relationships with various men; and she has been not be able to maintain either stable employment or housing.
Dr. Franklin diagnosed Ms. B as having the following major conditions: Post-Traumatic Stress Disorder (P.T.S.D.), Bipolar Disorder, Borderline Personality Traits (Petitioner's Exhibit E at page 7). Dr. Krulee concurred with Dr. Franklin's diagnosis with the following exceptions: (1) he diagnosed Ms. in as having Borderline Personality Disorder (rather CT Page 5521-be than Borderline Personality Trait) and (2) he also diagnosed Ms. B as having Attention Deficit Hyperactivity Disorder (A.D.H.D.) (Petitioner's Exhibit G at page 8). Dr. Crusto diagnosed Ms. B as having a dysthymia disorder (chronic depression) and a Borderline Personality Disorder. (Petitioner's Exhibit I at page 1). Dr. Conley's provisional diagnosis of Ms. B was one of dysthymia and Borderline Personality Disorder. During her testimony Dr. Conley testified that she is very conservative in making a diagnosis and can neither confirm, nor disaffirm, either the diagnosis of Bipolar Disorder or Borderline Personality Disorder.
Dr. Krulee and Dr. Crusto both diagnose B as having Borderline Personality Disorder, Dr. Franklin's diagnosis is Borderline Personality Traits and Dr. Conley can neither confirm nor deny Borderline Personality Disorder. Dr. Franklin noted in his testimony, however, that he "wanted to go with Borderline Personality Disorder but I gave her [Borderline Personality] traits because I don't have enough history on her . . . you want to be absolutely certain that's the correct diagnosis. So, it could be a disorder but in terms of the benefit of the doubt, I went with the trait." (Testimony of Dr. Franklin at page 48). Dr. Custo, who had the benefit of treating Ms. B for three (3) months and Dr. Krulee who examined Ms. B approximately fifteen (15) months after Dr. Franklin's initial evaluation both conclude that Ms. B has a Borderline Personality Disorder. The court agrees with the diagnosis of Borderline Personality Disorder. Borderline Personality Disorder was described by Dr. Krulee as:
. . . a deeply ingrained mal-adaptive pattern of behavior which causes either subjective distress or severe interpersonal dysfunction . . . borderline personality disorder . . . is characterized by emotional instability, relationship dysfunction, impulsivity in ways which can be self-damaging, problems with anger control, problems with manipulative, suicidal, or self-destructive behavior.
(Testimony of Dr. Krulee at page 10)
The court also agrees with the diagnosis made by Dr. Franklin and Dr. Krulee that Ms. B has Bipolar Disorder. Bipolar Disorder was described by Dr. Franklin as:
. . . two extreme . . . moods. From depression to mania. Individuals with this particular disorder have periods of depression and periods of extreme euphoria. They tend to engage in impulsive and acting out kinds of behavior, you cannot have both at the same time obviously, so you vacillate between one and the other. CT Page 5521-bf
(Testimony of Dr. Franklin at pages 13 and 14)
The court also agrees with the diagnosis made by Dr. Krulee's that Ms. B has P.T.S.D. Dr. Franklin described P.T.S.D. as:
. . . a set of symptoms relating to . . . multiple episodes of being victimized and abused. And these include some increased emotional re-activity, when she would be reminded of traumatic experiences.
(Testimony of Dr. Krulee at page 6)
Therefore, this court concludes that Ms. B has Borderline Personality Disorder, Bipolar Disorder, and P.T.S.D.
Initially, it is important to note that Ms. Bs mental health issues do not exist in a vacuum. These conditions led to real problems in parenting Victoria. These problems led to a ninety-six (96) hour hold being imposed as well as the granting of an O.T.C. approximately twenty-six (26) months ago. When Victoria was placed in the foster home of Bill and Penny C she was dirty, her hair was matted with food in it and she was found, on one occasion by Mrs. C naked, on her back, with her legs up in the air imitating a position she had seen her mother in. Ms. B's Bipolar Disorder in the depressed stage causes her to be lethargic to the point of being catatonic; the manic stage results in impulsivity, and difficulty in both concentrating and appreciating what is before her. In fact she told Dr. Krulee of severe mood swings that would result in her getting very angry, then very depressed. At times she had no motivation or energy and when Dr. Krulee saw her in August of 2001, she had been depressed at least eight (8) of the last twelve (12) months. She also told Dr. Krulee that her psychiatric condition has interfered with her ability to take care for her children in that she had little energy, was unable to get out of bed, neglected her personal hygiene and her nutrition to the point of losing substantial weight. Dr. Franklin noted in his report of his May 9, 2000, evaluation of Ms. B (Petitioner's Exhibit E) that Ms. B has a "deficit with respect to her capacity to anticipate the logical consequences and nuances of interpersonal interactions . . . [she] demonstrates poor insight and judgement with adequate common sense reasoning." (Petitioner's Exhibit E at pages 5 and 6).
The descriptions of these mental health diagnosis and their effects on her ability to parent Victoria are not meant to demonize or stigmatize Ms. B but to show the depth and seriousness of her mental health issues. CT Page 5521-bg
What are the problems associated with the treatment of an individual with Ms. B's diagnosis?
Both Bipolar Disorder and P.T.S.D. can be treated somewhat easily. However, according to Dr. Franklin "there is no cure for [Borderline] Personality Disorder" (Testimony of Dr. Franklin at page 17). Dr. Franklin also concluded that a major problem in treating individuals with Borderline Personality Disorder is that they often do not recognize that they have a problem When they do recognize that there is a problem, start treatment and start making progress they think they are doing well and they think they do not need to keep taking their medication and stop, reversing any progress that they have made. In addition, Dr. Franklin testified that it is harder to treat a person who has both Bipolar Disorder and Borderline Personality Disorder.
What progress, if any, had Ms. B made prior to August, 2001?
Dr. Franklin concluded in his May, 2000, report that:
I am not of the opinion that [Ms. has obtained a level of mental stability that would allow for her to care for another at this time . . . Ms. B has not been sufficiently treated for her mental condition and given the vacillations of her mood, would likely be overwhelmed with the discharge of her parental responsibilities. . . . (Petitioner's exhibit E at page 7 and page 12)
Fifteen (15) months later, Dr. Franklin noted that although Ms B is becoming aware of her mental health problems, she still had not sufficiently addressed her mental health issues.
The next issue is whether Ms. B has made any progress in addressing these issues since August, 2001.
Both Dr. Franklin and Dr. Krulee noted in August of 2001, that Ms. B had started to gain some insight into her mental health issues. On approximately August 1, 2001, Ms. B started treating with Dr. Conley. She has consistently seen Dr. Conley once a week since that time to assess her diagnosis, counseling, and individual therapy. Dr. Conley has prescribed Paxil for depression and Zyprexa to help her sleep at night. She has been compliant with her medication, calls when she is unable to attend a therapy session, and also calls when she needs to see Dr. Conley if there is an issue that needs to be addressed immediately. CT Page 5521-bh
Ms. Bs lifestyle has improved. During the autumn of 2001, Ms. B obtained her G.E.D. In January of 2002, she started attending a two-year associate degree program at Gateway College. In May of 2001, she met Keith B and married him on November 8, 2001. Her husband works for Wayside Furniture and supports Ms. B while she attends Gateway full time. Ms. B and her husband pay rent to live in a house owned by Mr. Bs aunt on Henry Street in New Haven. She has lived in this home since July, 2001.
The progress Ms. B has made is to be viewed critically. Dr. Conley testified that Ms. B may wake up in a good mood or a bad mood and that it may change throughout the day. This is one of the things that they are trying to deal with. According to Dr. Franklin, Ms. B is bright and has a number of skills. Given the "highs" and "lows" of Borderline Personality Disorder and Bipolar Disorder these past months of progress may be one of those periods when Ms. B is able to function well.
How long would it take for Ms. B to achieve the stability to parent Victoria?
Not only did the mental health professionals temper their opinions as to the apparent progress Ms. B has made but they qualified their opinions as to what would be required to determine if Ms. B was rehabilitated, stable, and capable of parenting Victoria.
During the examination of the mental health experts there was much testimony concerning the length of treatment and/or stability that would be required for Ms. B to show that she could resume caring for Victoria. Dr. Franklin stated that he would require a minimum of six (6) months of stability and a further six (6) month period to see how Ms. B was coping in the community. The level of compliance is affected by the level of motivation, which is, in turn, motivated by the pending T.P.R. However, this time frame would according to Dr. Franklin, be only a barometer as to how Ms. B is doing. Dr. Franklin noted however, that Ms. B's history of early trauma has not been addressed. Dr. Franklin concludes that "with regard to her [Ms. providing care to this child at this time that would be contingent upon a very long and protracted period of her being involved in therapy" (emphasis added) (Testimony of Dr. Franklin at page 27). Dr. Franklin further noted in his May 2000, evaluation that "Ms. B has the capacity to provide care and nurturance to Victoria, as well as discharge the duties of a parent . . . [and believes] in time this could be achieved." (Emphasis added) (Petitioner's Exhibit E at page 12). Fifteen (15) months later Dr. Franklin noted that Ms. B had still not sufficiently addressed her mental health concerns that manifest as CT Page 5521-bi emotional instability and was still an immature individual who could not handle the responsibilities of parenting a young child. Dr. Franklin concluded that Ms. B might achieve a position over time where she could parent Victoria. Dr. Franklin testified that before Ms B could care for Victoria on a day-to-day basis "an extended period of stability" would be required and that for Ms. B ability to provide care for Victoria would be "contingent upon a very long and protracted period of her being involved in therapy" (Emphasis added) (Testimony of Dr. Franklin at page 19 and page 27). Dr. Franklin notes that "a reasonable amount of time in counseling should occur before any discretion to transfer Victoria to Ms. B should occur (Emphasis added) (Petitioner's exhibit F at page 5) and "an extended and protracted period of time would be required before Ms. B could adequately be determined to have rehabilitated herself" (Emphasis added) (Petitioner's Exhibit F at page 14). Dr. Krulee also expressed an opinion that a three (3) to six (6) month period of stability would demonstrate a level of progress. However, taking care of a child would add a "new dimension" to the time frame for Ms. B's rehabilitation.(Testimony of Dr. Krulee at page 14). In addition, Dr. Krulee was "guarded" in his estimate because he is unsure if Ms. Bs progress can be ascribed to an "true awakening" or the threat of a T.P.R. (Testimony of Dr. Krulee at page 18). Dr. Krulee also noted that Ms. continued insight into her problems are "largely dependent upon the success of her current romantic relationship. . . . [and] that it remains to be seen if [Ms. can sustain a healthier degree of interpersonal functioning over an extended period of time" (emphasis added)" (Petitioner's Exhibit G at pages 9 and 10). In response to a question of how long it would take for Ms. B to achieve her address her mental issues, Dr. Conley testified that "If Christina continues to work the way she is working now and really prioritizing what's most important to her, I think one (1) to two (2) years would be a good estimate" (emphasis added) (Testimony of Dr. Conley at page 172).
What is the prognosis for Ms. B?
The treatment that Ms. B is receiving is appropriate for her mental health issues. However, Dr. Conley could not make the prognosis that Ms. B could successfully address her Borderline Personality Disorders. The treatment that Ms. B is receiving is not, according to Dr. Conley a "magic wan" that can be waved to make people better. Dr. Franklin added that there is no "blue pill" to treat Borderline Personality Disorder. In addition, Dr. Krulee is guarded" in his hopefulness of Ms. B's progress: "people have been telling her she need to do these things for a year, year and a half (1 1/2). You need to be in treatment. You need to take medication. And she hadn't done it until T.P.R. papers were filed. . . . CT Page 5521-bj how much of her motivation comes from the threat of a T.P.R. versus a true awakening and . . . some improvement in her maturity level . . . I can't answer. (Testimony of Dr. Krulee at pages 17-18). To quote Dr. Krulee the only way to see if Ms. B has achieved an awareness of her mental health issues and is motivated to treat them because of this awareness or is motivated by the pending T.P.R. and will decompensate if the threat of a T.P.R. is removed "would be to see what happens" (Testimony of Dr. Krulee at page 46).
The touchstone that the court must use is addressing this issue is stated succinctly in In re Roshawn R. Is rehabilitation foreseeable
within a reasonable amount of time? Given the number and seriousness of mental health conditions of Ms. B and their effect on her ability to parent Victoria; the difficulty in treating these conditions; Ms. B's lack of insight into these conditions and her failure to take advantage of programs offered to address these conditions prior to August, 2001; the fact that Ms. B's progress since August, 2001, may be only temporary; the fact that possibly the only reason for the treatment is the pending T.P.R.; the possible time required for treatment; and the unsure prognosis that the treatment will be effective, this court concludes that Ms. B cannot achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child.
Therefore, D.C.F. has proven by clear and convincing evidence the statutory ground alleged as to the respondent mother: that she is the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding and has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the Victoria.
MS. B AND VICTORIA — NO ONGOING PARENT-CHILD RELATIONSHIP
The second ground alleged against the respondent mother by D.C.F. is no ongoing parent-child relationship. C.G.S. Section 17a-112 (j) (3) (D) provides for the termination of parental rights if, upon clear and convincing evidence, it is proven that no ongoing parent-child relationship existed in excess of one year.
Victoria and Ms. B have had many visits after Victoria was removed from Ms. B. Visitation has, at times, been rocky. Ms. B missed a number of visits. On one visit she had an angry outburst resulting in visits being CT Page 5521-bk held at D.C.F. On another visit, Victoria sang happy birthday to Ms. B. Ms. B responded that "it sucked being sick on [her] twenty-first (21st) birthday" (Testimony of Lori Read at page 50). Victoria, at times stated she did not want to visit with Ms. B and, for a period of time, Victoria either defecated or urinated in her underwear after the visits. Ms. B took a considerable length of time to notice that Victoria had a haircut or earrings. In addition, Victoria liked the visits better when her sister Mariah was there.
However, Penny C, Victoria's foster mom, acknowledged that Victoria loves her mother. Victoria has photos in her room of Ms. B and Mariah and wears a baby ring that Ms. B gave to her on a necklace. According to Lori Read, Victoria refers to Ms. B as "mommy Christina" and hugs her when she visits with Ms. B. Dr. Franklin concluded after his parent-child interactive observation of Ms. B and Victoria on May 9, 2000, that Victoria had clearly bonded to Ms. B, that Victoria recognized Ms. B as her mother and treated her as a parental authority figure, that Ms. B and Victoria showed affection toward each other, and that Ms. B acted appropriately with Victoria. In his August 21, 2001, parent-child interactive observation Dr. Franklin continued to see Ms. B as a "significant agent" in the life of Victoria. Dr. Franklin testified that Ms. B and Victoria have a parent-child relationship. Therefore, the court concludes while Ms. B and Victoria have far from a perfect parent-child relationship, D.C.F. has failed to maintain its burden of proof on the ground of no parent-child relationship existing between Victoria and Ms. B.
JOHN DOE — FAILURE TO REHABILITATE
On of the grounds alleged by D.C.F. concerning John Doe is that he is the parent of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding and has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child. This ground tracks the language contained in Conn. General Section17a-112 (j) (3) (B) (i).
In order to terminate the parental rights of John Doe on this ground, D.C.F. must initially show by clear and convincing evidence that it has made reasonable efforts to locate the him and to reunify the child with the him, unless the court finds in this proceeding that the he is unwilling or unable to benefit from these reunification efforts. CT Page 5521-bl
D.C.F. published a notice in the New Haven Register informing John Doe that a T.P.R. petition had been filed. There has been no response by any man to the publication, nor has any other man been named as the putative father by Ms. B (with the exception of Willard H — who was excluded as Victoria' father after a paternity test), nor had any other man come forward claiming to be Victoria's father (with the exception of Milton M — who was excluded after as Victoria's father after a paternity test). Therefore, the court finds that D.C.F. has proven by clear and convincing evidence that it has made reasonable efforts to locate the father of Victoria.
Because John Doe, the biological father, has not come forward, nor has any other man come forward claiming to be Victoria's father (with the exception of Willard H), nor has any other man been named by Ms. B as Victoria's father (with the exception of Milton M), D.C.F. could not provide services to rehabilitate this individual so that he could assume a position in Victoria's life. Therefore, the court finds this ground has been proven by clear and convincing evidence.
JOHN DOE AND VICTORIA — NO ONGOING PARENT-CHILD RELATIONSHIP
Because neither John Doe, nor any other man has come forward (with the exception of Willard H) or has been named by Ms. B as Victoria's father (with the exception of Milton M), the ground of no ongoing parent-child relationship has also been proven by clear and convincing evidence.
JOHN DOE AND VICTORIA — ABANDONMENT
Because neither John Doe, nor any other man has come forward (with the exception of Willard H) or has been named by Ms. B as Victoria's father (with the exception of Milton M), the ground abandonment has also been proven by clear and convincing evidence.
 DISPOSITION
In the dispositional phase of a termination case, the court must consider whether D.C.F. has proven by clear and convincing evidence that termination is in the best interest of the child.
Before making a decision whether or not to terminate the respondent mother's and/or respondent father's parental rights the court must consider and make findings on each of the seven criteria set forth in Conn, Gen Stat. Sec. 17a-112. CT Page 5521-bm
These criteria and the court's findings, which have been established by clear and convincing evidence, are as follows:
(1) The court must look at the timeliness, nature and extent of services offered, provided, and made available to the parent and child by an agency to facilitate the reunion of the child with the parents. D.C.F. made considerable efforts to help Ms. B for approximately fifteen (15) months after the O.T.C. was confirmed with her problems. In addition D.C.F. provided services for approximately two (2) years prior to the O.T.C. D.C.F. provided referrals to a multitude of agencies to address all of the Ms. B's issues and provided individual assistance to Ms. B. Services were offered to address a myriad of uncared for related issues: mental health issues, substance abuse, housing, employment and parenting. These services were not taken advantage of. Despite Ms. B's recent progress, given the nature and severity of her mental health issues and the uncertain prognosis for her achieving mental health stability it is unreasonable to conclude that she will be able to effectively parent Victoria within a reasonable amount of time.
The biological father has not been identified nor come forward to take advantage of any services to facilitate re-unification with Victoria.
(2) This court finds that D.C.F. made reasonable efforts to reunite Ms. B with Victoria pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, as amended. For the reasons set forth previously, the court finds that D.C.F. offered appropriate services and sufficient time for Ms. B to reunify with her child.
This court finds that D.C.F. was justifiably prevented from making reasonable efforts to reunite the biological father with Victoria pursuant to the Federal Adoption Assistance and Child Welfare Act of 1980, as amended because the biological father has not been identified nor come forward.
(3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order must also be addressed. Final Specific Steps were signed by Ms. B on September 5, 2000, and were approved by the court (Brenneman, J.) on that same date. (Petitioner's Exhibit A). Ms. B has failed to comply with the Specific Steps.
There were no Specific Steps ordered for Victoria's biological father as the biological father has not been identified nor come forward. CT Page 5521-bn
(4) The feelings and emotional ties of the child with respect to the child's parents, any guardian of the child, and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant ties must be addressed. According to Dr. Franklin, Victoria and Ms. B are bonded and there is a parent-child relationship between Ms. B and Victoria. Ms. B according to Dr. Franklin is the psychological parent of Victoria.
However, Victoria also has strong emotional ties with her foster parents and her foster siblings. Victoria has been placed in a foster home with Bill and Penny C since January 28, 2000. As such her foster parents have exercised physical care, custody or control of the child for twenty seven (27) months. During this time there has developed a strong bond between Victoria and her foster parents and between Victoria and her foster siblings. She calls Mrs. C mommy and Mr. C daddy. She fits right in with the other children in the family. Lori Read testified that the Cs are warm and caring towards Victoria and there are many physical signs of affection between the Cs and Victoria. Dr. Franklin echoed this observation when he testified that the ems were nurturing and loving with Victoria. Dr. Franklin concluded in his August 21, 2001, evaluation that "Victoria appeared to have a more established and consistent bonding with the Cs [compared to the relationship between Victoria and Ms. B that was similar to that often seen between biological child and parent." (Petitioner's Exhibit F at page 9). He also noted that the degree of physical contact between the Cs and Victoria demonstrated a degree of bonding not there between Ms. B and Victoria.
Therefore, Victoria views Ms. B, Mr. C and Mrs. C as her parents.
Victoria has no feelings or emotional ties to her biological father because she has had no contact with him.
(5) Victoria just turned five (5).
(6) The efforts the parent has made to adjust her or his circumstances, conduct or conditions to make it in the best interest of the child to return to such home in the foreseeable future, including but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions, and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child. CT Page 5521-bo
Ms. B has had, at best, inconsistent visitation with Victoria. According to Mrs. C, Ms B missed approximately one half (1/2) of her visits. When Victoria was first placed with the Cs, Mrs. C would call Ms. B every night so that Victoria could talk to her. Then for approximately eight (8) months Ms. B was allowed to call the C house to talk with Victoria. This was stopped by the Cs when Ms. B called and left a rude message on their answering machine near Thanksgiving of 2000.
The biological father has not come forward to either visit or communicate with Victoria.
(7) The final consideration is the extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any person or by the economic circumstances of the parent. This court is unaware of any unreasonable act or conduct by anyone or any agency or of any economic circumstance that prevented either Ms. B, or the biological father from having a meaningful relationship with Victoria. To the contrary the Cs have done everything in her power to facilitate Victoria reunifying with Ms. B They allowed nightly telephone calls between Ms. B and Victoria for a substantial period of time, a rare practice for foster parents. They save all the items that Ms. B gives Victoria. They were responsible for continued visits between Victoria and Ms. B by successfully stopping Victoria's defecation and urination after visiting with Ms. B by telling Victoria how badly "mommy" (Ms. B) would feel if the visits stopped.
 BEST INTEREST OF THE CHILD
The court has determined that the ground for termination of parental rights of the respondent mother and the respondent biological father have been proven by clear and convincing evidence. The court has also determined that the seven (7) statutory criteria which all weigh in favor of termination being in Victoria's best interest, have been established by clear and convincing evidence.
Before undertaking an analysis of what is in the best interest of Victoria the Court must address a troubling aspect of this case. Ms. B has made progress in treating her mental health needs and has stabilized her life in many ways — she has gotten her G.E.D. and is attending Gateway Collage, she has entered into a stable relationship which has resulted in marriage and she has stable housing. She has made strides in addressing her problems. It troubles this court greatly that a decision CT Page 5521-bp to grant the T.P.R. may adversely effect the seeming progress that Ms. B has made. However, the focus of the T.P.R. is not the effect that granting the T.P.R. may have on Ms. B, but what is in the best interest of Victoria.
When Victoria was placed with the Cs she was dirty, had food matted in her head, was not toilet trained and simulated sexual positions that she had seen her mother in. She described mommy Christina's house as "dirty and junky" and said that all she got to eat was cereal. Since being placed with the Cs, she has been toilet-trained (within a week), is physically clean, has her own room, lives in a pleasant home where she participates in many family activities, enjoys Mrs. Cs cooking, and has all her medical needs addressed promptly and thoroughly by the Cs. Besides providing for Victoria's physical necessities, the Cs include Victoria in family activities and Mrs. C reads to and teaches Victoria. Victoria fits in so well in the C family that, according to D.C.F. social worker Paulette Limato, "If you are an outsider, you would not know that she [Victoria] is a foster child" (Testimony of Paulette Limato at page 125). In addition, Victoria views Mr. and Mrs. C as her psychological parents.
Although Victoria is only a child of five (5) she is, according to many of the witnesses, a bright child. She has expressed, on a number of occasions her desire to remain with the Cs. She told Lori Read that she wanted to live with the Cs. She has told the Cs on many occasions that she does not want to go back home with Ms. B. On particularly striking example of the depth of Victoria's adversity to going back to Ms. B was when, at the age of three (3), while riding with the Cs on Front Avenue she remembered that she lived in a house on this road and started screaming that she did not want to go home (it was later confirmed that Victoria did indeed live on this street).
Although Ms. B is presently contesting the T.P.R., petition on two occasions in the recent past she expressed to Lori Read that she wished to give up her parental rights and wanted the Cs to adopt Victoria. According to Ms. Read on October 3, 2000, Ms. B told her that she was thinking of giving up her parental rights. In April of 2001, Ms. B asked Ms. Read to speak to Mrs. C about adopting Victoria. In addition, Mrs. C testified that Ms. B in a telephone conversation asked Mrs. C if she and Mr. C would be interested in "taking over" Victoria. Mrs. C testified that this conversation took place three (3) months prior to her testimony (she testified on October 9, 2001) although on cross-examination she indicated the conversation may have occurred around Mother's Day, 2001. CT Page 5521-bq
In May of 2000, Dr. Franklin was of the opinion that Ms. B could not take on the responsibility of taking care of a child. In August of 2001, his opinion was that Ms. B was still not able to handle the responsibility of caring for a child. Indeed Dr. Franklin was of the opinion that Ms. B was not fully capable of being a viable and contributing adult.
Victoria has been in D.C.F.'s custody for twenty-seven months. Dr. Franklin has characterized the past twenty-seven (27) months as a "long and protracted ordeal for [Victoria] (Testimony of Dr. Franklin at page 36). The Court agrees with Dr. Franklin when he states that the decision regarding Victoria's permanency should be pursued "with some immediacy". The longer Victoria stays with Cs, the more problematic any possible separation from them will be. His opinion is that Victoria remain with the Cs. The court agrees with this opinion.
The Cs have said that they will adopt Victoria if she is free for adoption. It is in the best interest of Victoria that she remain with the Cs for a number of reasons. Remaining with the Cs will enhance her development. She has been with, and has thrived with, the Cs for twenty-seven (27) months. A separation from the Cs will undermine her emotional stability with long term consequences. Returning her to her mother would be detrimental.
In addition Dr. Franklin has stated that Victoria has the ability to compartmentalize her emotions about Ms. B. That is she is able, according to Dr. Franklin to" put her mother's issues in one box and connect with her on one level and not connect with her mother on another level which might be detrimental to her (Testimony of Dr. Franklin at pages 31-32). This ability will, no doubt help Victoria adjust to any loss she may feel due to Ms. B's parental rights being terminated.
Based on the foregoing findings, the court determines, by clear and convincing evidence, that it is in the best interest of Victoria that a termination of parental rights be entered with respect to the mother, Christina B, and the unknown biological father, John Doe. Accordingly, the court hereby grants the termination petitions. The court further orders that the Commissioner of D.C.F. is appointed statutory parent for Victoria. The Commissioner shall file with this court no later that thirty days following the judgement a written report of efforts to effect a permanent placement for Victoria and file further reports as are required by state and federal law. CT Page 5521-br
Gerard F. Esposito Judge of the Superior Court